IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| DARLENE MOORE, | ) |
| | ) |
| Plaintiff | ) |
| | ) |
| vs. | )    No. 02 C 5130 |
| | ) |
| THE CITY OF CHICAGO, et al., | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Darlene Moore filed this action against defendants City of Chicago, and Chicago Police Officers Bradley, Threet, Parker and Gibson-Edwards, for deprivation of her civil rights guaranteed by the Constitution, in violation of 42 U.S.C. § 1983. Defendants now move for summary judgment on several counts of plaintiff's fourth amended complaint. For the following reasons, we grant the motion of the City of Chicago for summary judgment, and grant, in part, the motion of defendant officers.

## BACKGROUND

All facts are undisputed unless otherwise noted. In those instances, we credit plaintiff's version of the facts since on a motion for summary judgment we are required to construe the record in the light most favorable to the non-moving party. Payne v. Pauly, 337 F.3d 767, 770 (7th Cir. 2003). Facts have been omitted that are either irrelevant to the issues before the court or that rely on inadmissible evidence for their support.

In September 2001, plaintiff Darlene Moore was either the owner of or held the power of attorney for her parents who were the owners of a building at 7956 S. Aberdeen in Chicago, Illinois. On September 10, 2001, a roofer named Bogdan Blazej went to the 7900 block of

South Aberdeen to perform a roofing job on the building next to plaintiff's property. Upon surveying the job, Blazej realized that he would need to throw the old roofing materials off the side of the building he was working on – between that building and plaintiff's building.[1] At the end of the work day on September 10, 2001, Blazej and his workers cleaned everything before leaving.

On September 11, 2001, plaintiff went to the building at 7956 S. Aberdeen. When she arrived, she found the neighbor's roofers using her property – roofing debris, tarps and plywood covered her property, and in some places the debris was ankle deep.[2] Plaintiff also observed a dumpster on the street, a ladder, and boards that were on her property where the workers were wheeling garbage to the dumpster on the street. Plaintiff attempted to speak with the workers, but they refused her request and laughed at her (Moore dep. p. 82).[3] Plaintiff then called the police and requested assistance because the workers were trespassing and throwing refuse on her property.

---

[1]Blazej testified at his deposition that he spoke with a young man who told him that the owner of 7956 S. Aberdeen occupied the first floor apartment of that building (Blazej dep. p. 9). He said he went to the first floor apartment and spoke with an older lady who identified herself as the owner of the building (*id.*). He explained to the owner that he and his workers were removing the neighbor's roof and would be placing the roofing debris on her property, but would clean it up every day (*id.* at 21-24). He assured the owner that they would be protecting her property (*Id.* at 139-40). He testified that the owner agreed it would be alright to use her property, and Blazej believed he had her permission (*id.*). Plaintiff denies that Blazej ever spoke with the young man or the older woman. She asserts that the young man Blazej describes is Eddie Moore, who testified that he first became aware of the roofing on September 11, 2001, when he heard and saw roofing material hitting his apartment windows (Eddie Moore dep. p. 31). The older woman Blazej described was allegedly Mrs. Tharbs, plaintiff's mother, and she testified that she learned of the construction when she saw the men working, and did not know what they were doing (Tharbs dep. p. 36-38).

[2]The parties disagree as to the extent of damage to plaintiff's property. Defendants assert that the only damage was the "walking down" of the grass (Moore dep. pp. 75-78; Bradley dep. pp. 40-41). Plaintiff testified that not only was the grass trampled down, but there was debris all over her property (Moore dep. p. 75-78).

[3]Blazej testified that he did not laugh at her and that his workers did not speak English and thus could not refuse her request (Blazej dep. pp. 65-66).

Officer Bradley responded to the call, and when she arrived plaintiff told her that the workers were throwing materials on her property, causing damage, and she wanted them off her property. Plaintiff suggested to Officer Bradley that the workers should use the space behind and on the other side of the building – part of the property they were working on – instead of using her property. Officer Bradley asked plaintiff if she was the owner of the property, and asked to be shown where the workers were damaging her property. Bradley did not see any damage to plaintiff's property and saw that the workers had laid a tarp to protect the property (id.). Bradley then left plaintiff and went to the building that was being worked on and spoke to that owner (Moore dep. pp. 81-87).[4] At some point Blazej, who had left the work site to purchase some supplies, returned and saw police cars and the plaintiff on her cell phone. Blazej spoke with a female officer and told her he had obtained permission from the owner of plaintiff's building to use the property in between the two buildings to catch the roofing materials. Upon her return, Bradley told plaintiff that the workers were not damaging her property and that they could continue working.

Unhappy with Officer Bradley's response, plaintiff called 911 again, asking for a supervisor. She explained that an officer had come out but had said that it was fine for the work to continue despite the fact that the workers were trespassing on her property.[5] While plaintiff was on the phone, Sergeant Threet arrived and plaintiff gestured to him that she would be a minute (Moore Dep. pp. 92-93). Sergeant Threet then went over and spoke to the

---

[4]Bradley testified that she went next door and spoke to plaintiff's parents who indicated that they did not have a problem with the workers working next door. (Bradley dep. pp. 41-45).

[5]Bradley testified that she also called for a supervisor (Bradley dep. p. 46).

workers, and then walked back to his car (*id.* at 93-94).[6] Plaintiff told him she had called for help and that the workers were trespassing on her property. (*Id.*). Sergeant Threet responded by threatening her, "I'll lock your ass up if you say one word to them" (Moore Dep. p 95). Plaintiff exclaimed that his threat was inappropriate and that she was going to call for his supervisor and Threet responded by threatening to arrest her if she said or did anything else (*id.* at 95-96). Threet went back to his car and plaintiff again phoned the police, requesting a supervisor (*id.* at ¶ 21; plf. stmt. of facts ¶ 10). Shortly thereafter, Threet returned with Bradley and additional officers (Moore dep. pp. 98-101).

Plaintiff's nephews, Larry Martin and Tim Moore, had been standing a few houses away when Larry observed their aunt speaking with the police. Larry observed the police leave and his aunt get on her phone. When the police officers returned, Larry, Tim and their friend approached the house. Blazej spoke with Sergeant Threet and told him that he was concerned for his safety and that of his workers because there were a number of men out there whom Blazej believed were friends of Moore.

Plaintiff asserts that during this entire time she never screamed or used profanity; that the only time she raised her voice was in response to one of the officer's threats after her arrest (Moore dep. p. 116-119).[7] She further asserts that she never interfered with the workers.

---

[6]Sergeant Threet and Officer Bradley testified that when Threet arrived, he first spoke to Bradley before speaking to the workers. Moore testified that Bradley had already driven away when Sergeant Threet arrived (Moore Dep. p. 89). Bradley testified she went over to explain the situation to Threet. She testified that she told Threet that the property was not owned by Moore, but rather owned by her parents and they did not have a problem with the workers (Bradley dep. p. 48). Threet testified that Bradley told him that the workcrew was repairing the roof and that plaintiff was standing in the way, and that plaintiff said she had power of attorney over the building and the workers were damaging her property (Threet dep. p. 39-40, 56).

[7]Defendant officers testified that plaintiff was yelling and screaming at them and the workers and using profanity (Bradley dep. pp. 55-56; Threet dep. pp. 48-49, 55, 61-62; Parker dep. p. 73). They also assert that she was getting in the way of the workers (Threet dep. pp. 62-63; Parker dep. pp. 46, 72-73). Blazej testified that plaintiff was excited and came within three feet of him, yelling at him to get off her property (Blazej dep. pp. 122-26).

Blazej testified that he did not work during this time and that while he usually has more workers on the roof, he brought them down to clean up the debris on the ground faster (Blazej dep. pp. 148-49). He also testified that his workers worked the entire time, and that he never saw plaintiff interfere with his workers, never heard her refuse to leave the area or use profanity (*id.* at 122-23). He testified that he was not afraid of her (*id.* at pp. 52-54).

Blazej told Threet that he and his workers just wanted to do their job. The officers asked Blazej if he wanted to sign a complaint. Blazej agreed to sign the complaint and did so "in order to finish the job." The complaint that Blazej signed was a blank form. Officer Bradley filled in the complaint after returning to the station.[8] Plaintiff was arrested on the charge of disorderly conduct in that she "did knowingly and intentionally was [sic] loud and profane. Refused to leave the area. Interfering with construction workers repairing a building, behaving in such an unreasonable manner as to alarm and disturb Blazey Boychow [sic] and provoke a breach of the peace" (plf. stmt. of facts ¶ 22).[9] Blazej asked the female police officer when the court date would be and wrote down the information. Blazej kept the papers he received from the officers for a long time, but testified that he had no intention of going to court.

Sergeant Threet told plaintiff that she was under arrest and told Officer Bradley to arrest her. Plaintiff testified that, during her arrest, her arm was twisted and injured during her arrest. She testified that the manner of her arrest constituted excessive use of force by the officers.

_____

[8]Having a witness sign a blank complaint form is against Chicago Police Department policy because the witness is supposed to affirm under oath that everything written in the complaint was true (plf. stmt. of facts ¶¶23-24).

[9]Blazej indicated during his deposition that everything contained in the complaint is true and accurate as to what happened.

Plaintiff did not complain of pain to her arm to any officer while at the scene, or on the way to the station. At approximately 3:57 p.m., plaintiff was booked in the female lockup center. Officer Gibson-Edwards was the police officer assigned to the lockup from 2:00 p.m. to 10:00 p.m. Two civilian detention aides were also assigned to the lockup. At the intake screening, plaintiff indicated to the lockup attendant that she had a history of seizures and took medication for those seizures. However, she did not tell the lockup attendant that she needed to take her medication.

Plaintiff did not request any medical attention until after she was in the lockup, at which time she told the attendant that she had "some pain and . . . some swelling," but she could "make it." After approximately two hours, plaintiff told the staff that she was in pain and needed to see a doctor. From the time of her initial complaint, until her release, plaintiff made numerous complaints and requests for medical attention to everyone that passed her cell – all to no avail. Every fifteen minutes the lockup facility staff conducted cell checks, where they would observe each individual in the lockup. Office Gibson-Edwards conducted approximately 29 cell checks during her shift, of which 14 were between 6:00 p.m. and 10:00 p.m. Gibson-Edwards admits that she had direct contact with plaintiff and periodically checked on her throughout her shift.[10] At 7:15 p.m., on September 11, 2001, Officer Gibson-Edwards and her supervisor, Lt. Bara, entered the lockup and walked through the cell blocks together. At one point, when an officer came to the cell and heard plaintiff's complaint, she responded, "I ain't no doctor." Plaintiff's testimony is not clear as to the identity of this officer but stated that she was the same officer who was at the desk when plaintiff entered the lockup.

---

[10]However, Officer Gibson-Edwards testified that she was never told by plaintiff or any of the other staff members that plaintiff was in pain and desired medical attention (Gibson-Edwards dep. pp. 10-11, 19, 63).

(Moore dep. pp. 198-199, 203-205). Detention Aide Dorothy Hudson began her shift in the female lockup on September 11, 2001, at 10:00 p.m., and her shift ended at 6:00 a.m. the following morning. During her tour, from 10:00 p.m. until plaintiff was released, Hudson did 18 cell checks.[11]

At some point plaintiff had a seizure in her cell. She believed she suffered a seizure because when she woke up she was laying on the bench and felt shaky and dizzy. She was not sure what time it occurred as there were no clocks and she had no concept of time (Moore dep. pp. 182-84). She estimated that it may have been between 11:00 p.m. and 12:00 a.m., but she could not say for sure (id. at pp. 184-85). When she regained consciousness, a supervisor and another officer were at her cell. The officer was the same one that was behind the desk at the time she entered the lockup.[12] Plaintiff told these two officers that she had had a seizure, that she was in pain, and showed them her swollen arm, which she was unable to move. Both officers walked away without rendering any aid.

While in the lockup plaintiff was never provided with any medical attention. Upon her release around 4:30 a.m., she went home, took pain medication and laid down to rest. Plaintiff went to Provident Hospital around noon (Moore dep. p. 209), complaining to the medical personnel that her arm was twisted by the police and she had pain to her right elbow and wrist, and that her arm was "swollen up like a balloon." She also told medical personnel that

---

[11]Hudson testified that plaintiff never complained to her of any pain or that she had a seizure, nor was Hudson told by anyone else that plaintiff was complaining of pain or had suffered a seizure (Hudson dep. pp. 6-7, 41-43, 48).

[12]Defendants point out that plaintiff stated her seizure occurred at some point between 11:00 p.m. and 12:00 a.m., and a shift change occurred at 10:00 p.m., so that the officers present at 11:00 could not have been there when she entered the lockup (Moore dep. pp. 182-85, 190-91; Gibson-Edwards dep. p. 5). However, plaintiff's statement was an estimate and she testified that she could not say for sure that the seizure occurred at that time because there were no clocks.

she had a history of seizures and that she reported having two partial seizures at other points in time. She reported that she was non-compliant with her medication and stated that her last seizure had been the night before. Medical records indicated there was no obvious edema noted to the elbow, but that the right wrist had erythemic area (redness) to its radial side (plf. exh. U). Plaintiff was treated for pain and swelling in her wrist and arm. She had a loss of range of motion in her wrist.

Plaintiff returned to Provident Hospital on September 27, 2001, and after her shoulder was x-rayed on that date, the reviewing radiologist was unsure whether there was a scapular fracture of the shoulder. Plaintiff also had her elbow x-rayed again.[13] Plaintiff's condition progressed and she was subsequently diagnosed with Complex Regional Pain Syndrome. As a result she has contractures in her hand which have left her with a permanent loss of range of motion. The charge against plaintiff was dismissed by the State's Attorney, with leave to reinstate.

On July 7, 2002, plaintiff filed a complaint in this court alleging a deprivation of her civil rights as guaranteed by the Constitution in violation of 42 U.S.C. § 1983. Plaintiff filed several amended complaints, culminating in the consolidated fourth amended complaint. That complaint consists of nine counts, of which Counts I, III, IV, V, VI and VII are relevant here. These counts allege excessive force, failure to intervene, denial of medical care, unreasonable seizure under the Fourth Amendment, and malicious prosecution by one or more of the named officers. All of the foregoing counts allege that the conduct of the officers, as described therein, was undertaken pursuant to the practice and policy of the Chicago Police Department.

---

[13]Defendants assert that a comparison of this x-ray and the one taken on September 12, 2001, revealed that there was no joint effusion in the elbow (Roskam dep. pp. 70-76).

In discovery, the City produced 204 Complaint Register Investigations ("CRs") which are civilian complaints of alleged police misconduct. The CRs produced by the City were limited to those that occurred in the Sixth District (the district in which plaintiff's alleged incident occurred) in the two years prior to plaintiff's alleged incident, and involved allegations similar to plaintiff's, namely the use of excessive force and false arrest. Plaintiff retained an expert, Joseph Stine, a former police chief of New Britain Township in Pennsylvania and the executive officer of the Police Training Bureau for the City of Philadelphia. Stine reviewed 114 of the 204 CRs, due to constraints on time and money, and based on his review, opined that the conduct of Officers Bradley, Threet and Parker were the result of the failure of the investigations units of the Chicago Police Department to investigate adequately citizen complaints and discipline officers for misconduct.

Defendants Bradley, Threet, Parker and Gibson-Edwards moved for summary judgment regarding Counts IV, V, VI, and VII. The City of Chicago moved for summary judgment as to Counts I, III, IV, V, and VI. Plaintiff does not oppose summary judgment against the officers on Counts VI and VII, or the City on Counts IV and VI, but argues against summary judgment on all remaining counts.

## ANALYSIS

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Pro. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (U.S. 1986). We must evaluate admissible evidence in the light most favorable to the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986). Summary judgment is not appropriate "if the evidence

is such that a reasonable jury could return a verdict for the nonmoving party." Payne, 337 F.3d at 770. We begin with the defendant officers' motion, and then turn to the City's motion.

## Chicago Police Officers

## Count V - False Arrest Against Officers Bradley, Threet and Parker

Defendants Bradley, Threet and Parker claim that they are entitled to summary judgment on plaintiff's false arrest claim because there is no question of material fact that probable cause existed to arrest plaintiff. In the alternative, defendants argue that they are entitled to qualified immunity because a reasonable officer could have mistakenly concluded that probable cause did exist for the arrest.

## Probable Cause

The existence of probable cause is an absolute defense to a § 1983 claim against police officers for wrongful arrest, even where the defendant officers allegedly acted upon a malicious motive. Mustafa v. City of Chicago, 442 F.3d 544, 547 (7th Cir. 2006). Police officers have probable cause to arrest an individual "when the facts and circumstances within [their] knowledge and of which [they] have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." Jones v. Webb, 45 F.3d 178, 181 (7th Cir. 1995) quoting Beck v. Ohio, 379 U.S. 89m 91 (1964). We evaluate probable cause "not on the facts as an omniscient observer would perceive them but on the facts as they would have appeared to a reasonable person in the position of the arresting officer," seeing what she saw, hearing what she heard. Kelley v. Myler, 149 F.3d 641, 646 (7th Cir. 1998). Since the determination of probable cause requires consideration of the totality of the circumstances, it will generally present a question for the

jury. Jones, 45 F.3d at 182. However, summary judgment is appropriate "when there is no room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them." Qian v. Kautz, 168 F.3d 949, 953 (7th Cir. 1999).

Defendant officers first argue that they had probable cause to arrest plaintiff for criminal trespass. Defendants rely on the case of Kelley v. Myler, 149 F.3d 641 (7th Cir. 1998), which held that police officers relying on the statement of a property owner who claimed that the plaintiff was trespassing on his property gave the officers probable cause to arrest the plaintiff, despite that it was later determined that plaintiff, when arrested, was on the public way. Id. Here, however, defendant officers supply no evidence that would give them probable cause to arrest plaintiff for criminal trespass. In Illinois, criminal trespass to land requires that the suspect "enter[ ] upon the land of another, after receiving, prior to such entry, notice from the owner or occupant that such entry is forbidden; or remain[ ] upon the land of another, after receiving notice from the owner or occupant to depart." 720 ILCS 5/21-3 (2007). Defendants present no evidence that plaintiff was ever present on the land of another, let alone that she was notified by the owner or occupant not to enter or remain on such land. Therefore, no reasonable jury could find that the officers had probable cause to arrest plaintiff for criminal trespass.

Defendant officers assert that they had probable cause to arrest plaintiff for disorderly conduct, based on their observations of her actions at the scene. In Illinois, disorderly conduct is defined as "any act [committed] in such an unreasonable manner as to alarm or disturb another and to provoke a breach of the peace." 720 ILCS 5/26-1 (2007). Defendants rely on the portions of their statement of facts where they assert that plaintiff was yelling and screaming at them, Blazej and the workers, using profane language and physically impeding

the workers by standing in between them and jumping from side to side. If this testimony was not controverted, there would be little question that defendants had probable cause to arrest. But the testimony is controverted by the plaintiff herself, and to some extent, by Blazej. Plaintiff testified that she did not yell or use profanity and that she did not get in the workers' way. Plaintiff testified that the only time she raised her voice was in response to a threat from one of the officers after she was arrested. Blazej testified that while he did hear plaintiff yelling at him, he did not hear her use profanity or see her impede his workers. On a motion for summary judgment we must "avoid the temptation to decide which party's version of the facts is more likely true." Payne, 337 F.3d at 770. Furthermore, plaintiff "need not match [defendants] witness for witness . . . nor must she persuade the court that her case is convincing, she need only come forward with appropriate evidence demonstrating that there is a pending dispute of material fact" (id. at 771). This plaintiff has done. The conduct plaintiff testified that she engaged in could not reasonably have given the officers probable cause to arrest her for disorderly conduct. Plaintiff's testimony and the reasonable inferences we must draw therefrom raise a genuine issue of material fact as to her conduct during the period in question and preclude summary judgment.

Defendant officers further argue that they had probable cause to arrest plaintiff based on the signed complaint of Blazej. Generally, if police officers "arrest a person on the basis of a private citizen's complaint that, if true, would justify the arrest, and they reasonably believe it is true, they cannot be held liable for a violation of the Constitution merely because it later turns out that the complaint was unfounded." Rodgers v. Lincoln Towing Services, Inc., 771 F.2d 194, 200 (7th Cir. 1985). Blazej signed a complaint against plaintiff and the defendants arrested her based on that complaint. Defendants argue that this is sufficient

evidence of probable cause. However, all of the cases cited by defendants involved conduct engaged in by the arrestee prior to the arrival of the police officers, and thus the officers necessarily relied on the statements (either oral or written) of the complainant in determining whether there was probable cause to arrest.[14] The problem here is that plaintiff's alleged conduct occurred while the officers were present. Blazej himself arrived on the scene after the police officers. His complaint is therefore subject to the same considerations as the officers' observations of plaintiff's conduct, because the officers must reasonably believe that his complaint is true. Whether or not the officers reasonably believed Blazej's complaint was true depends on whether or not plaintiff was actually engaging in the conduct complained of. The officers' presence precludes blind reliance on the complaint of Blazej, because such reliance would be unreasonable if in fact plaintiff was not engaging in the conduct alleged in the complaint, which she testifies she was not. Furthermore, even though Blazej testified in his deposition that everything in the complaint was true, he further testifies that he did not witness plaintiff engage in some of the conduct described in the complaint, such as using profanity or interfering with his workers. Since there is a genuine dispute as to whether plaintiff actually engaged in what could reasonably be seen by the officers as disorderly conduct, defendant officers cannot point to the signed complaint alone as evidence of probable cause to arrest.

---

[14]Plaintiff makes much of the fact that the complaint form Blazej signed was blank, and later filled in by Officer Bradley at the station. We find this to be irrelevant under the current facts, as, if plaintiff had been engaging in the conduct alleged, the officers would have been justified in arresting her regardless of whether Blazej's complaint was made orally or in writing. Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 434 (7th Cir. 1986)("No principle of federal law makes a properly attested complaint necessary to an arrest .... Police often arrest suspects on the basis of oral reports from witnesses"). The question here is whether plaintiff was in fact engaging in this conduct, because if she was not, then the police were not reasonable in relying on Blazej's complaint as they were also present to witness plaintiff's conduct during the period in question.

**Qualified Immunity**

Defendant officers next assert that they are entitled to qualified immunity on plaintiff's false arrest claim. Qualified immunity protects officers performing discretionary functions from civil liability so long as "their conduct does not violate clearly established statutory or constitutional rights that a reasonable person would know about." Mustafa, 442 F.3d at 548. To determine whether an official is entitled to qualified immunity, we engage in a two-part inquiry. We must first determine whether the law was clearly established at the time of the alleged violation, asking whether the law was clear in relation to the specific facts confronting the public official when he or she acted. Second, we analyze the objective reasonableness of the defendant's conduct, asking whether reasonably competent officials would agree on the application of the clearly established right to a given set of facts. Kelley, 149 F.3d at 648.

Neither party argues against the fact that plaintiff's right to be free from arrest without probable cause was not clearly established at the time of the incident. *See* Beck v. Ohio, 379 U.S. 89, 91 (1964). Therefore, we need only analyze the reasonableness of defendants' conduct. In doing so, we find that defendants are not entitled to summary judgment on the issue of qualified immunity.

When the arrestee challenges the officer's description of the facts and presents a factual account where a reasonable officer would not be justified in making an arrest, then a material dispute of fact exists. Where there is a genuine issue of material facts surrounding the question of plaintiff's conduct, we cannot determine, as a matter of law, what predicate facts exist to decide whether or not the officer's conduct clearly violated established law. Morfin v. City of East Chicago, 349 F.3d 989, 1000 (7th Cir. 2003).

For the reasons cited above regarding probable cause, summary judgment on the issue of qualified immunity is precluded as to Count V of the fourth amended complaint.

## Count IV - Denial of Medical Care against Officer Gibson-Edwards

Defendant Officer Gibson-Edwards argues that she is entitled to summary judgment on plaintiff's denial of medical care claim because she was not present at the time when plaintiff claims she had her seizure and was denied care, nor did she act with deliberate indifference to plaintiff's request for medical care.

A state official violates the due process rights of a pretrial detainee when she acts "with deliberate indifference toward the detainee's serious medical needs." Qian v. Kautz, 168 F.3d 949, 955 (7th Cir. 1999). Deliberate indifference is akin to recklessness and "'reckless[ness]' describes conduct so dangerous that the deliberate nature of the defendant's action can be inferred." *Id.* We must first determine whether the defendant "actually knew about the plaintiff's condition, not whether a reasonable officer should have known." *Id.*

Plaintiff admits that when she arrived in the lockup she told the lockup personnel she had some pain in her arm, but that she could handle it. She further admits that she told the lockup personnel that she had a history of seizures for which she took medication, but did not tell them that she needed or would need any. Defendant makes much of plaintiff's testimony that her seizure occurred at 11 p.m., an hour after defendant's shift ended, so that defendant could not be personally responsible for the denial of medical care to plaintiff. However, plaintiff's testimony is not so precise. She testified that she did not know what time she had the seizure because there were no windows and no clocks. She stated that it could have been about 11 p.m., but that she could not say for sure. After her seizure, she stated that two officers were there and she told them she had seized. One of those officers had been present

at the desk when she entered the lockup (Moore dep. pp. 190, 192). Plaintiff further testified that she believed the shift changed occurred after her seizure because after that point the officers making the rounds were different. (*Id.* at 197-98). Furthermore, she stated that she began requesting medical care within two hours after she entered the lockup, when Gibson-Edwards would have still been on duty. Thus an inference could be made that Gibson-Edwards was present and on-duty when plaintiff was requesting medical care.

However, plaintiff fails to ever identify Officer Gibson-Edwards in her deposition as one of the officers from whom she requested medical care. She testified that she did not know Officer Gibson-Edwards by name (Moore dep. p. 190). She did not identify by name any of the officers or attendants from whom she requested medical care (*Id.* at pp. 159-214). Nor did she demonstrate that any officer or jail personnel who walked by her cell when she was requesting medical care informed Officer Gibson-Edwards of that fact (*Id.*). What we can glean from the record is that at some earlier point plaintiff identified certain officers in a photo array (*Id.* at pp. 203-205). But the results of that photo array are not anywhere in the record – we do not have the photos plaintiff selected, the identity of the officers in the photos, or the reason why plaintiff participated in the photo array in the first place. Without evidence of plaintiff's identification of Gibson-Edwards as an officer from whom she requested medical care, or without any evidence that other jail personnel informed Gibson-Edwards of plaintiff's requests, plaintiff does not raise a genuine issue of material fact that Officer Gibson-Edwards was responsible for plaintiff's medical care, and thus, the officer is entitled to summary judgment on Count IV.[15]

---

[15]Based on this conclusion, we do not reach Officer Gibson-Edwards' argument that plaintiff's medical needs were not "serious." *See* Gutierrez v. Peters, 111 F.3d 1364, 1373 (7th Cir. 1997).

City of Chicago

First we note, simply as an aside and unrelated to the outcome of this case, that we are often unsure of the impetus behind alleging Monell claims in cases such as this one. As is clear in this case, claims of municipal liability require an extensive amount of work on the part of plaintiff's attorneys and experts, and an extraordinary amount of money must be spent in order to prepare and prove them. But to what end? If the plaintiff prevails against the officer on a § 1983 claim, he or she is not likely to want or need to proceed any further, at least in this district and state. An Illinois statute directs local governments to pay tort judgments for compensatory damages for which its employees are liable, see 745 ILCS 10/9-102; the Seventh Circuit has held that this statute permits the § 1983 plaintiff to bring a claim directly against the municipality and obtain a judgment requiring the municipality to pay the amount due to the plaintiff from the officer. Wilson v. City of Chicago, 120 F.3d 681, 684-85 (7th Cir. 1997). Nor do we believe the municipality is more likely to be deterred when sued in its own capacity given that Monell claims rarely make it to trial. Furthermore, even if the city is found liable, punitive damages are not an available remedy. City of Newport v. Fact Concerts Inc., 453 U.S. 247 (1981).

We do understand that the Monell claim may be the only viable avenue left if the officers are found to have violated plaintiff's constitutional rights, but are nevertheless protected by qualified immunity. Montville v. Lewis, 87 F.3d 900, 902 (7th Cir. 1996)(officers may be entitled to qualified immunity even where they violated plaintiff's constitutional rights). However, this is a rare occurrence indeed, and we have only been able to find one case in this circuit which discusses such a scenario. Montgomery v. City of Chicago, No. 86 C 3872,

1991 U.S. Dist. LEXIS 12784 (N.D. Ill. June 26, 1991). Having said this, we turn now to plaintiff's claim against the City.

The City argues that it is entitled to summary judgment on Counts I, III and V of the fourth amended complaint. These counts allege that the excessive force used by the defendant officers, the failure to prevent the use of excessive force, and the false arrest effected by the officers were all the result of a practice or policy of the City.

In order to establish a claim against the City, plaintiff must follow the requirements outlined by <u>Monell v. New York City Dept. of Social Services</u>, 436 U.S. 658 (1978), and its progeny. Plaintiff must first prove that she has suffered a constitutional violation. <u>Los Angeles v. Heller</u>, 475 U.S. 796, 799 (1986). We have noted in the above discussion relating to plaintiff's claims against the individual officers that plaintiff has sufficiently alleged such a violation for the purposes of summary judgment. Thus, plaintiff has met this first requirement. Second, plaintiff must show that "deliberate action attributable to the municipality itself is the 'moving force' behind the plaintiff's deprivation of federal rights." <u>Bd. of County Comms'rs of Bryan County v. Brown</u>, 520 U.S. 397, 400 (1997).

Plaintiff may show that her alleged constitutional injury is attributable to the municipality in one of three ways. She may prove that "an express policy...when enforced, cause[d] a constitutional deprivation." <u>McTigue v. City of Chicago</u>, 60 F.3d 381, 382 (7th Cir. 1995). She may also prove that it was caused by "a widespread practice that, although not authorized by written law or express municipal policy [is] so permanent and well settled as to constitute a custom or usage with the force of law." *Id.* Finally, she may prove that her injury was caused by "the act of a person with final policymaking authority." *Id.*

Here, plaintiff has alleged that her constitutional injury was the result of a practice or custom of the City. Custom is demonstrated "by showing a series of bad acts and inviting the court to infer from them that the policymaking level of government was bound to have noticed what was going on and by failing to do anything must have encouraged or at least condoned, thus in either event adopting, the misconduct of the subordinate officers." Estate of Novack v. County of Wood, 226 F.3d 525, 531 (7th Cir. 2001). A custom "generally implies a habitual practice of a course of action that characteristically is repeated under like circumstances," and thus the "isolated act of an employee generally is not sufficient." Jones v. City of Chicago, 787 F.2d 200, 204 (7th Cir. 1986).

The City asserts that plaintiff cannot demonstrate that there is a widespread practice regarding the failure to investigate and discipline officer conduct adequately. The City argues that plaintiff's expert's review of only 114 of the 204 CRs does not constitute a representative sample from which conclusions may be drawn about the existence of a practice or custom regarding investigations and discipline of officers. Plaintiff argues that she plans to rely on all 204 CRs, not just the 114 that her expert reviewed, and even if she is limited to relying on the 114, that that number is sufficient to demonstrate the widespread practice of the City.[16] We find that we need not address this issue for the reason that, regardless of whether plaintiff's sample of CRs is representative or whether it demonstrates a widespread practice regarding the failure to adequately investigate and discipline officers, plaintiff has failed to demonstrate a genuine issue of material fact that the City acted with deliberate indifference.

---

[16]We disagree that plaintiff may rely on all 204 CRs as evidence. Even if plaintiff could lay a proper foundation for the remaining CRs not reviewed by her expert, and even if they could be admitted for a purpose other than for the truth of the matter asserted, plaintiff has not produced any witness that could testify about them. The 90 CRs cannot be admitted into evidence without a witness to testify about their relevance to this case, as plaintiff's expert purports to do with the other 114.

In order to assert that the City failed to exercise reasonable care in investigating and disciplining its officers for excessive force or false arrest, plaintiff still must meet the deliberate indifference standard of <u>Canton v. Harris</u>, 489 U.S. 378 (1989). This is a high threshold to overcome, "even where significant evidence has been presented indicating flawed investigatory procedures, courts still reject the failure to investigate theory where plaintiff[ ] cannot demonstrate 'tacit authorization by city policymakers.'" <u>Kindle v. City of Harvey</u>, 2002 U.S. Dist. LEXIS 2408, *10-11 (Feb. 14, 2002) quoting <u>Canton</u>, 489 U.S. at 397. Here deliberate indifference must be shown on the part of the City Council, the policymaker in this case. The City argues that plaintiff cannot show that it acted with deliberate indifference because the Council held hearings in July 1997, and June 1999, regarding allegations of police misconduct and use of excessive force. During these hearings the Council heard from aldermen, victims and other speakers on various problems with the department's investigatory and disciplinary systems. In January 2000, it passed a resolution calling for input regarding the disciplinary process during the contract negotiations with the Fraternal Order of Police. As a result of these negotiations, a provision was placed in the contract that called for the retention of "not-sustained" files for a period of seven years, instead of the five years called for in the prior contract. The provision also provided for, in future disciplinary proceedings where allegations of excessive force or criminal conduct are present, the use of information contained in "not-sustained" files in order to determine credibility and notice. The City claims that this contract was ratified by the City Council on March 26, 2002, but provides no supporting evidence. Plaintiff concedes that these hearings occurred and that the Council worked to place the provision in the contract. Plaintiff claims, however, that the City's conduct simply shows that the City had affirmative knowledge about the inadequate investigation and discipline of the

police officers. Plaintiff asserts that such action does not defeat her claim because the City's deliberate indifference can be shown in the fact that, as of 2005, the contract provision providing for use of not-sustained findings in later OPS investigations was not included in the written OPS policy.

We find record before us demonstrates that the City Council cannot be said to have been deliberately indifferent to the practice of ineffective investigation and discipline of police officers. Deliberate indifference requires the municipality to have made a "deliberate choice to follow a course of action." Canton, 489 U.S. at 389. Such a choice is akin to the municipality's "further adherence to an approach they know or should know has failed to prevent tortious conduct in the past." Bryan County, 520 U.S. at 407. Plaintiff concedes that the Council held hearings, proposed and caused changes to be included in a contract with the Fraternal Order of Police based on its knowledge of OPS's practices and procedures. The Seventh Circuit has held that the "[f]ailing to eliminate a practice cannot be equated with approving it." Wilson v. City of Chicago, 6 F.3d 1233, 1240 (7th Cir. 1993). Thus, the eventual failure of the City Council's proposed changes is not sufficient evidence of the Council's deliberate indifference. Id. Even if the Council's actions could be seen as negligent, or even grossly so, that is not enough under this Circuit's deliberate indifference standard. Id.; see also Doe v. Dallas Ind. School Dist., 153 F.3d 211, 219 (5th Cir. 1998). Analogous to the Seventh Circuit's finding in Wilson, had the Council not held hearings or proposed changes, and simply turned a blind eye to repeated complaints about OPS policy, it could be inferred that the Council acquiesced in that policy – thus adopting it. Wilson, 6 F.3d at 1240. But that is not what happened here. The Council did make efforts to change the way citizen complaints were investigated, and on these facts plaintiff must show "that in doing this [the Council] was

not acting in good faith to extirpate the practice." *Id.* Plaintiff has not made such a showing, and therefore we grant summary judgment in favor of the City on all counts.

## CONCLUSION

For the foregoing reasons, we grant defendant officers' motion for summary judgment on counts IV, VI and VII of the fourth amended complaint, deny their motion as to count V, and grant the City's motion for summary judgment on all counts.

**JAMES B. MORAN**
Senior Judge, U. S. District Court

_____ Oct. 15 _____, 2007.
Oct. 15, 2007